**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 25-11743

Non-Argument Calendar

————————————

MARK D. DAVIS,

                                    *Plaintiff-Appellant,*

*versus*

JAMES DISTEPHANO,
CHRISTINA KEETON,
DANNY WESSON,

                                    *Defendants-Appellees.*

————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 3:23-cv-00581-HNJ

————————————

Before JORDAN, ROSENBAUM, and WILSON, Circuit Judges.

PER CURIAM:

Mark Davis, proceeding *pro se* on appeal, appeals the district court's grant of summary judgment on his claims under 42 U.S.C. § 1983 and state law alleging false arrest, malicious prosecution, and conspiracy. The district court found that Davis's claims failed because he was lawfully seized pursuant to a valid warrant supported by probable cause. We agree that probable cause supported Davis's arrest, so we affirm the grant of summary judgment.

## I.

On October 4, 2020, Lauderdale County deputies responded to a domestic disturbance at Davis's residence. The deputies obtained oral and written statements indicating that a physical altercation occurred between Davis and his 18-year-old daughter, Katie, when Katie went to gather items from the home to stay a second night at the home of her boyfriend, whom Davis did not like. At some point, Defendant Danny Wesson, the boyfriend's grandfather, arrived outside the home while the deputies were present and threatened to harm Davis. No one was arrested at the scene. One deputy told Katie that, if she wanted to pursue charges, she should go to the Sheriff's Office and meet with investigators in the Special Victims Unit ("SVU").

Deputy Jason Brown prepared a short report after the incident. He explained that he responded to a "domestic between father and daughter" and spoke with and obtained written statements from the parties. Both Davis and Katie claimed the other was the aggressor. Davis said that Katie "became violent toward him hitting him and he tried to restrain her," while Katie alleged

that Davis "became violent toward her hitting her and put his hands around her neck." Deputy Brown noted that he "observed a mark on the father's arm and no marks or bruising on the daughter Katie's neck, arm or legs."

The next day, Katie, her boyfriend, and his mother went to the Sheriff's Office's SVU, where Defendants James DiStefano[1] and Christina Keeton worked. When DiStefano saw them arrive, he directed Keeton to handle the interviews because his wife was related to the boyfriend's family. Keeton then interviewed Katie and her boyfriend. Keeton also watched body camera footage from the responding deputies and reviewed the written statements.

During the interview, Katie said that, when she was in her bedroom gathering belongings, Davis began yelling at her, swung a belt at her, and pinned her against the wall by her arms. She got away and went outside to drop off the items in her boyfriend's truck. She tried to reenter the home to gather additional items, telling Davis she did not want to argue, but Davis blocked her path and then grabbed her by the arms. When she tried to push him away, he threatened to "lay [her] ass on the ground" if she did that again, before putting his hand on her throat and pushing her up against the wall. Keeton's boyfriend reported seeing Davis put his hand around Katie's neck and push her against the wall.

At her deposition, Keeton testified that she considered Davis's claim that Katie was the aggressor. But Keeton discounted

---

[1] The complaint misspelled Defendant DiStefano's last name as "DiStephano."

that theory because Davis admitted on the body-cam footage that he had retrieved a belt and swung it at her multiple times "before any statement was made about her trying to be . . . violent against him."[2]  Keeton also observed that Katie's voice was noticeably hoarse on the body-cam footage, which was consistent with her allegation of being choked.  Keeton found that Katie's statements during the interview were consistent with her comments at the scene, the body-cam footage, and her apparent injuries.

The next day, October 6, Keeton applied for and obtained a warrant to arrest Davis for third-degree domestic violence.  She signed a criminal complaint, referencing an "attached officer's affidavit incorporated by reference," and included a police report containing narratives from Keeton and from Deputy Brown.  DiStefano helped Keeton execute the arrest warrant on October 7, 2020.  At some point before Davis's arrest, DiStefano took photographs of several bruises on Katie's arms at Wesson's home and emailed them to Keeton.

---

[2] Davis's own deposition testimony tends to confirm that point.  Davis testified that, when he went to grab the belt, Katie was "yelling," "screaming," and "yapping," but he didn't suggest she had been physically violent.  He also admitted that he swung a doubled-over belt at Katie for disciplinary reasons, and "probably tapped her with it . . . a couple times."  And he confirmed he pushed her up against the wall with his hand near her neck, though he maintained he did so to defend himself from Katie's blows.

Davis spent one night in custody before his release on bond. Ultimately, in February 2022, the state dismissed the prosecution with leave to reinstate.

## II.

In May 2023, Davis filed a counseled complaint against DiStefano, Keeton, and Wesson, alleging claims of false arrest, malicious prosecution, and conspiracy under 42 U.S.C. § 1983 and state law. Davis alleged that he had been arrested without probable cause and at the behest of Wesson, who had a "vendetta" against him. The parties consented to a magistrate judge exercising jurisdiction and entering final judgment.

The magistrate judge granted the defendants' motions for summary judgment and denied Davis's cross-motion. The judge reasoned that, because Davis was arrested pursuant to legal process, his claim was for malicious prosecution rather than false arrest. But Davis could not sustain a claim for malicious prosecution, according to the judge, because the criminal complaint was not defective and was supported by probable cause, notwithstanding Davis's alleged justifications of self-defense and reasonable parental discipline. The magistrate judge also found that the conspiracy claim failed for lack of an underlying constitutional violation. Davis appeals *pro se*.

## III.

We review de novo a district court's grant or denial of summary judgment. *Hardigree v. Lofton*, 992 F.3d 1216, 1223 (11th Cir.

2021).  In conducting our review, "[a]ll evidence and factual infer-ences are viewed in the light most favorable to the non-moving party, and all reasonable doubts about the facts are resolved in fa-vor of the non-moving party."  *Id.*

### A.

A § 1983 claim for malicious prosecution is a "claim for un-reasonable seizure pursuant to legal process."  *Thompson v. Clark*, 596 U.S. 36, 42 (2022).  A claim of false arrest, in contrast, stems from a warrantless seizure.  *See Williams v. Aguirre*, 965 F.3d 1147, 1158 (11th Cir. 2020) ("A claim of false arrest or imprisonment un-der the Fourth Amendment concerns seizures without legal pro-cess, such as warrantless arrests.").  Because Davis was seized pur-suant to legal process (an arrest warrant), the district court cor-rectly analyzed Davis's claims as claims for malicious prosecution rather than for false arrest.  *See id.*

To prove a § 1983 malicious-prosecution claim, "a plaintiff must establish four elements: (1) the plaintiff was seized under legal process; (2) the legal process justifying the plaintiff's seizure was constitutionally infirm; (3) the suit or proceeding terminated in the plaintiff's favor; and (4) the seizure would not otherwise be justified without legal process."  *Gervin v. Florence*, 139 F.4th 1236, 1248 (11th Cir. 2025).  Only the second element is at issue here.

A plaintiff can prove that legal process was constitutionally infirm by showing either (1) "that the officer who applied for the warrant should have known that her application failed to establish probable cause," or (2) "that the officer intentionally or recklessly

made misstatements or omissions necessary to support the warrant." *Butler v. Smith*, 85 F.4th 1102, 1112 (11th Cir. 2023) (cleaned up).  Misstatements or omissions must be material, meaning "probable cause would be negated if the offending statement was removed or the omitted information included." *Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019).

"Probable cause renders a seizure pursuant to legal process reasonable under the Fourth Amendment." *Washington v. Howard*, 25 F.4th 891, 898 (11th Cir. 2022).  "[P]robable cause exists if the totality of the circumstances could persuade a reasonable officer that there is a substantial chance of criminal activity by the person who is arrested." *Harris v. Hixon*, 102 F.4th 1120, 1126 (11th Cir. 2024) (quotation marks omitted).

We give "great deference" to a "magistrate's determination of probable cause." *Illinois v. Gates*, 462 U.S. 213, 236 (1983).  The Fourth Amendment is satisfied so long as the magistrate judge had a "substantial basis for determining the existence of probable cause." *Id.* at 238–39.  But the magistrate judge's "action cannot be a mere ratification of the bare conclusions of others." *Id.* at 239.  Rather, "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause." *Id.*

In assessing probable cause for a malicious-prosecution claim, we consider only the information that was presented to the magistrate judge, either orally or in writing. *Butler*, 85 F.3d at 1113.  So we can't justify a seizure by reference "to information in an officer's investigative file or mind absent a record that he submitted

the file to or explained his thought processes to the magistrate judge." *Id.* (quotation marks and ellipsis omitted).  Accordingly, "we consider only (1) the information that was before the magistrate . . . , minus (2) any material misstatements that [Keeton] might have made, plus (3) any material information that she omitted." *Id.*

## B.

Here, Davis cannot show that the legal process justifying his seizure was constitutionally infirm.  Even viewed in the light most favorable to Davis, the record shows that probable cause supported his arrest and that the warrant was not defective.[3]

The information Keeton presented to the magistrate judge in applying for the warrant supported a finding of probable cause.  *See Butler*, 85 F.4th at 1113.  There's no dispute that Keeton's warrant application included the police report containing narratives

---

[3] We reject Davis's contention that DiStefano and Keeton were acting outside the scope of their discretionary authority by conducting investigative and arrest functions.  *See, e.g.*, *Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019) (concluding that officers were acting within the scope of their discretionary authority because they "undertook all the challenged actions while on duty as police officers conducting arrest and investigative functions").  We decline to consider his newly raised argument that the Alabama Child Abuse Reporting Act, Ala. Code § 26-14-6.1, deprives law enforcement of the authority to investigate child abuse not involving schools or state-operated residential facilities.  *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) ("This Court has repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court.") (quotation marks omitted).

from her and Deputy Brown.  Thus, the magistrate judge was presented with the factual grounds on which Keeton believed a warrant should issue, not simply a "bare conclusion" of wrongdoing. *See Gates*, 462 U.S. at 238–39.  And while the police report consisted of hearsay, as Davis notes, probable cause may be based on hearsay so long as the magistrate judge has a substantial basis for crediting the information.  *Id.* at 242.  That's the case here.

Probable cause existed because the facts recounted in the police report "could persuade a reasonable officer that there is a substantial chance of criminal activity by the person who is arrested." *Harris*, 102 F.4th at 1126.  As relevant here, a person commits third-degree domestic violence under Alabama law if he or she commits the crime of harassment, *see* Ala. Code § 13A-11-8(a), against a family or household member.  *See* Ala. Code § 13A-6-132(a)(1).  Harassment means "[s]trik[ing], shov[ing], kick[ing], or otherwise touch[ing] a person," or "[d]irect[ing] abusive or obscene language . . . towards another person," with the intent to "harass, annoy, or alarm" that person.  Ala. Code. § 13A-11-8(a)(1).  To qualify under the term "alarm," the words or actions must "cause fear of imminent danger."  *City of Montgomery v. Zgouvas*, 953 So. 2d 434, 443 (Ala. Civ. App. 2006).

Davis admitted grabbing, touching, and striking Katie with a belt, satisfying the element of physical contact.  *See* Ala. Code § 13A-11-8(a)(1).  But he claimed he did these things for disciplinary reasons and to protect both himself and Katie from harm.  Katie's account, however, offered a different view.  In Katie's telling, Davis

was the aggressor and initiator of physical contact, and he used more substantial force than his statements suggested, including forcefully grabbing her arms and choking her against a wall. Thus, Katie's statements, if credited, establish probable cause to believe that Davis struck and otherwise touched Katie with the intent to put her in fear of imminent physical harm.

Davis contends that Katie's story was not credible because it relied "on statements from two under aged juveniles who disliked Davis's parental authority." But officers are generally entitled "to rely on a victim's criminal complaint as support for probable cause." *Rankin v. Evans*, 133 F.3d 1425, 1441 (11th Cir. 1998). And Keeton explained that Katie's statements during the interview on October 5 were consistent with her statements to Deputy Brown the day before, and with her boyfriend's statements to Keeton. While there was no "physical" supporting evidence at that time, in the form of bruises or red marks, nothing in the statute required physical injury, nor is it surprising that bruising not be immediately apparent. *See Huebner v. Bradshaw*, 935 F.3d 1183, 1188 (11th Cir. 2019) (reasoning that the absence of similar physical evidence was neither probative nor surprising in a battery case alleging "hair-pulling, cheek-punching, and wrist-scratching").

We reject Davis's argument that Keeton would have known that probable cause was lacking had she conducted a constitutionally adequate investigation. *See Rankin*, 133 F.3d at 1435 ("An arresting officer is required to conduct a reasonable investigation to establish probable cause."). Nothing in the record suggests that

Keeton "knowingly disregard[ed] or ignore[d] evidence or re-fuse[d] to take an obvious investigative step that would readily establish that [she] lack[ed] probable cause to arrest [Davis]." *Harris*, 102 F.4th at 1129.

Rather, undisputed evidence shows that, before applying for a warrant, Keeton interviewed Katie and her boyfriend, reviewed Deputy Brown's notes and the parties' written statements, and watched the body-camera footage, in which Davis offered his view of what happened. That was enough. Officers are not "required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances presented a sufficient basis for believing that an offense had been committed." *Huebner*, 935 F.3d at 1188 (alterations adopted).

Davis fails to identify any misstatements or omissions from the warrant application that would defeat the existence of probable cause. *See Paez*, 915 F.3d at 1287. No misstatements are alleged, and the only alleged omissions appear to relate to Davis's intent and justification. Davis notes that he had a "closed-fist bruise" on his chest that appeared on October 9, though Katie never denied pushing him away *after* he had grabbed her. Davis also testified that he restrained Katie in part as a means of parental discipline, noting that her pupils were dilated, that she was on probation for assaulting a peer, and that she had given up a college scholarship under pressure from her boyfriend.

But the fact that Davis may have had viable defenses based on parental disciplinary rights or self-defense does not defeat the

existence of probable cause. "[P]olice officers aren't lawyers; we do not expect them to resolve legal questions or to weigh the viability of most affirmative defenses." *Paez*, 915 F.3d at 1286. So Keeton was not required "to resolve legal matters in dispute, understand the nuances of any possible defense, or answer them in order to decide whether there was probable cause." *Id*. at 1289.

And the circumstances here, as detailed in Katie's statements to Keeton, could persuade a reasonable officer of a "substantial chance," *Harris*, 102 F.4th at 1126, that Davis's conduct fell outside the scope of any lawful use of force to discipline a minor[4] or to defend himself. *See* Ala. Code § 13A-3-23(a) (use of force by a parent); *Id*. § 13A-3-24(1) (use of force in self-defense). Moreover, other facts not presented to the magistrate judge tended to confirm Katie's story. Keeton provided unrebutted testimony that Katie's voice sounded hoarse on the body-cam footage, which was consistent with her allegation of being choked, and DiStefano took pictures of bruising on Katie's arms before Davis's arrest.

For these reasons, no reasonable jury could conclude that the legal process justifying Davis's seizure was constitutionally infirm. Keeton had probable cause to seek an arrest warrant for third-degree domestic violence, and her warrant application, even including the broader pool of information known or available to

---

[4] Davis notes that Katie was 18 years old and still a "minor" under Alabama law until she turned 19. *See* Ala. Code § 26-1-1(a). Even so, a reasonable officer could consider Katie's age as part of the totality of the circumstances.

know, provided a "substantial basis for determining the existence of probable cause." *See Gates*, 462 U.S. at 238–39.

Finally, Davis's briefing contains an array of stray grievances stemming from this incident, but he fails to explain how these matters show the absence of probable cause to support his arrest. Probable cause does not depend on the alleged motivations of DiStefano or Keeton or the impressions of the responding deputies. *See Whren v. United States*, 517 U.S. 806, (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). Nor is there any evidence that Wesson, despite his threatening comments to Davis and family connections to DiStefano, exercised any influence on Keeton, the SVU investigator who conducted the interview with Katie and applied for the warrant.

## IV.

Because probable cause supported his seizure, Davis cannot prove essential elements of his claims for false arrest, malicious prosecution, or conspiracy, whether under state or federal law. *See Washington*, 25 F.4th at 898; *Williams*, 965 F.3d at 1158; *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1260 (11th Cir. 2010) (stating that a § 1983 claim for conspiracy must "result[] in the actual denial of some underlying constitutional right"); *Haynes v. Coleman*, 30 So.3d 420, 423 (Ala. 2009) (listing the elements of malicious prosecution under state law, including "the lack of probable cause"); *Drill Parts & Serv. Co. v. Joy Mfg. Co.*, 619 So. 2d 1280, 1290 (Ala. 1993) (stating that conspiracy requires a "viable underlying cause of action"). We decline to consider any other arguments that Davis presented in

the district court but did not specifically raise in his briefing on appeal. *See Anderson v. Sec'y for Dep't of Corr.*, 462 F.3d 1319, 1331 (11th Cir. 2006) ("We have rejected the practice of incorporating by reference arguments made to the district courts.").

In sum, we **AFFIRM** the district court's judgment.